UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

RANDALL JOHN,

                        Petitioner,

    - against -

SUPERINTENDENT GRIFFEN,

                        Respondent.

------------------------------------X

13 Civ. 922 (RWS)

OPINION

A P P E A R A N C E S:

       Petitioner RANDALL JOHN, *Pro Se*

       SOUTHPORT CORRECTIONAL FACILITY
       Inmate Number: 09A3740
       P.O. Box 2000
       Pine City, New York 14871
       By:  Randall John, *Pro Se*


       Attorneys for Respondent SUPERINTENDENT GREEN

       ERIC T. SCHENIDERMAN
       ATTORNEY GENERAL OF THE STATE OF NEW YORK
       120 Broadway
       New York, New York 10271
       By:  Joanna Hersey, Esq.

**Sweet, D.J.**

Petitioner Randall John ("John" or "Petitioner") has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is being held in state custody in violation of his federal constitutional rights by respondent Superintendent Green ("Green" or the "Respondent").  For the reasons set forth below, Petitioner's motion is denied.

In this application for a writ of habeas corpus, Petitioner alleges (1) that he was denied due process of law because of an unduly suggestive show-up identification; (2) that the trial court improperly permitted a lay witness to provide expert testimony regarding cell phone site data; (3) that Petitioner was deprived of due process when the trial court allowed the jury to view a video of his co-defendant's arrest; and (4) that his sentence was excessive.

## I. Prior Proceedings

Petitioner's state custody arises from a judgment of conviction entered on July 9, 2009, in the New York County

1

Supreme Court following a jury trial of Robbery in the First Degree (New York Penal Law "Penal Law" § 160.15(2)), Robbery in the Second Degree (Penal Law § 160.10(1)), two counts of Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03(2)), and Criminal Possession of Marijuana in the Fifth Degree (Penal Law § 221.10). The court sentenced Petitioner to an aggregate term of imprisonment of fifteen years, to be followed by five years of post-release supervision.

On November 17, 2011, the Appellate Division, First Department, affirmed Petitioner's conviction, *see People v. John*, 89 A.D. 3d. 552 (2011), and leave to appeal to the New York Court of Appeals was denied on February 2, 2012, *see People v. John*, 18 N.Y. 3d 925 (2012).

On February 5, 2013, Petitioner submitted a writ of habeas corpus. On July 8, 2013, Petitioner requested an extension until September 11, 2013 to file his brief, which was granted. The Petitioner's motion was heard on submission and marked fully submitted on October 23, 2013.

2

## II.  Facts

Petitioner's underlying conviction arises out of a robbery committed on July 25, 2008.

### A. The July 25, 2008 Underlying Robberies and Subsequent Arrests of Petitioner and Co-Defendant Levon Pratt

On July 25, 2008, at about 8:50 p.m., Police Officer Asim Sheikh ("Sheikh") was on patrol in the vicinity of Dyckman Street and Tenth Avenue in Manhattan. (Pre-Trial Hearing Transcript, "H."; 14-18, 24-25, 35.) As he turned onto Tenth Avenue, Sheikh saw Levon Pratt ("Pratt") urinating while standing by a tan Yukon sports utility vehicle. (H. 18-20, 32, 35-36, 45-46.) The Yukon had a vanity license plate "BRYAN" and, displayed in the rear window, a temporary license plate issued by either Virginia or Tennessee. (Trial Transcript, "T."; 35-37, 40-41, 47-51, 58-59, 64, 70, 72-73, 75.)  Sheikh pulled over and asked Pratt what he was doing there, and Pratt replied that he was waiting for his aunt, who lived in a housing development across the street. (H. 18-21, 36-37, 54.) Sheik approached the vehicle and saw Petitioner sitting in the front passenger seat. He asked Petitioner to lower the car's stereo, which was playing

3

loudly. (H. 21-22, 33, 37, 54-55.) Sheikh then issued Pratt

summonses for public urination and excessive noise. (H. 21-24,

36-39, 46-56.)


At roughly the same time, Kental Shillingford

("Shillingford") was leaving the Harlem apartment he shared with

his parents and grandmother, and took a livery cab to the

vicinity of Academy Street and Sherman Avenue in Washington

Heights to buy marijuana.[1] (T. 77-85, 89-90, 149-50, 154-55, 180-

85, 216-17, 220-22.) Shillingford smoked marijuana about every

other day, but had not done so that day. Typically, he bought

marijuana in his neighborhood but, "once or twice every couple

of weeks," he went to Washington Heights to purchase a "high

grade" marijuana known as "Haze." (T. 85-88, 113, 159.) Although

Shillingford intended to buy only $40 to $50 worth of marijuana,

he took about $520 or $530 in cash because, later that night, he

intended to go out to celebrate his brother's birthday. (T. 90,

152, 155, 159, 217-19, 222-23.)

---

[1] Initially, Shillingford provided oral and written statements to the police
that he had gone to 584 Academy Street to meet a woman named Simone. Shortly
thereafter, Shillingford met with an assistant district attorney and admitted
that he had sought to buy marijuana. (T. 149-52, 166-67, 185-86, 204, 511,
524-25.)  Shillingford also admitted that, on April 19, 2000, he was arrested
for possession of two bags of marijuana and later pled guilty to a violation,
and that, on November 12, 1997, he sold crack cocaine to an undercover police
officer, and was arrested. (T. 81-83, 155-57, 224.)

At around 9:20 p.m., Shillingford arrived on Sherman
Avenue near Academy Street, and looked for a dealer from whom he
had previously purchased marijuana, but could not find him. (T.
91-92, 179-80, 204.) He then walked to Academy Street, between
Sherman and Post Avenues. Although he had not bought marijuana
there before, Shillingford had seen people gathered outside a
building on the street, and suspected that they were purchasing
drugs. (T. 91-93, 152-54.) Shillingford entered the lobby of 584
Academy Street, which was about 10 by 15 feet in size. (T. 93-
94, 113, 185-86, 190-93.)


There Shillington saw two Hispanic men talking to
Petitioner, a tall African-American man with "dark brown" skin
who wore a black t-shirt. (T. 94-95, 168, 204-05.) The lobby was
"decent[ly]" lit and Shillingford had no difficulty seeing the
mens' faces. (T. 99.) Petitioner was holding a "big" bag of
marijuana that would have cost between $400 and $500. (T. 96,
157-59.)

5

For about two or three minutes, Shillingford waited on the far side of the lobby. He was not paying close attention to the conversation, although he overheard one of the men say something to the effect of "that's the same thing from yesterday." (T. 95-99.) Eventually, the "tone" of the conversation turned "mean" and Petitioner began to raise his voice. (T. 99-100, 189-90.)  Shillingford saw that Petitioner had a black pistol in his hand. (T. 100.) Petitioner pointed the gun at Shillingford and ordered him to come across the lobby. (T. 100-01, 187-89, 216.)

When Shillingford complied, Petitioner told him and the other men to "empty [their] pockets" and "get down the floor."  Shillingford handed Petitioner his cell phone and about $520 or $525 in cash; the two men also handed Petitioner their cell phones. (T. 101-02, 178-79, 196-98, 213.) Shillingford got down on the floor and heard people coming down a stairwell that emptied in the lobby. Petitioner then ordered the victims to stand up. (T. 102, 107, 190, 196-201.)

When Shillingford stood up, he saw Pratt standing directly in front of him; he was wearing a red t-shirt and was a

6

"little lighter skinned" and "stockier" than Petitioner. (T.
103-04, 107-08, 168.) Shillingford had an unobstructed view of
Pratt's face. (T. 104.) Pratt told Shillingford, "[G]ive me
everything you got," and tapped Shillingford's pockets[2]. (T. 104,
168-69, 209.) Pratt pulled his hand halfway out of his right
pants pocket and was holding "something shiny [and] silver."
Shillingford was "99 percent sure" that Pratt was displaying the
top of a gun[3]. (T. 104-05, 173, 207.) Petitioner held his gun
behind his back as three or four people came down the stairs and
passed through the lobby, and then walked out of the building
with Pratt.  (T. 107-09, 213-14.)


    The victims followed Petitioner and Pratt outside as
they got into a "light-colored" Yukon with a black license plate

---

[2] At trial, Shillingford initially testified that, when Pratt tapped his
pockets, it was the only time one of the robbers touched him. However, after
being confronted with his grand jury testimony, Shillingford stated that
Petitioner grabbed him by the arm or wrist when he first called him across
the lobby. (T. 168-71, 197-98, 215-16.)

[3] On July 25th, Shillingford told the police that Pratt had had a "silver" or
"shiny" gun, although he did not recall if he included the detail in his
written statement. (T. 201-02, 205-06, 212-13, 222-23.) Before the grand
jury, Shillingford testified that he did not see "exactly" what the object
was that Pratt displayed. (T. 206-07.)

with white lettering that spelled out "BRYAN."[4] (T. 110-20, 134-35, 159-65, 214.) Shillingford and the other men chased the SUV as it drove onto Academy Street and then onto Post Avenue. A video camera mounted on Academy Street recorded the Yukon driving by and Shillingford and two men running in pursuit. (T. 116-17, 130-33, 208-09; People's Exh. 5 [video].) At Post Avenue, the other victims gave up the chase, but Shillingford continued to run to Dyckman Street, where he flagged down a livery cab. (T. 117, 120-22, 130.)

The Yukon was still in sight, and Shillingford asked the driver to follow the Yukon and to call the police. (T. 121, 135, 173-75.) In the cab, Shillingford followed the Yukon toward the FDR Drive. He lost sight of the Yukon for "about two seconds" as it had turned onto Post Avenue and for "three or four" seconds as it had turned onto Dyckman Street, but otherwise had the Yukon in view from the time he saw the SUV outside 584 Academy Street. (T. 116-17, 122, 125-26, 130-31, 179, 214-15, 245-46.)

---

[4] Initially, Shillingford thought that the SUV was a "Tahoe." (T. 120, 135, 163-67, 509-10, 513-14, 531-32.) Yukons and Tahoes have the "same body" and look "exactly alike." (T. 120, 135, 163-67, 244, 301, 347, 351-53.) Shillingford also initially told police that the Yukon had a "unique" license plate, but in his written statement, Shillingford did not record the license plate. (T. 167, 201-02, 509-10, 513-14, 531-32.)

8

At about 9:40 p.m., Passarella was conducting a traffic stop on Harlem River Drive near Dyckman Street when Kental Shillingford ran up to him and said that he was "just robbed" at gunpoint by two black men. (H. 64-66, 90-94, 100, 105-09.)  Shillingford pointed to a light-colored SUV about 45 feet away that was turning south onto Harlem River Drive. (H. 65-68, 93-94, 117-18, 122-27.) Passarella got in his marked police car and began to pursue the Yukon, while radioing for additional units. (H. 67-70, 95-96, 110.)

Officer Passarella never lost sight of the Yukon as he followed it south. He began his pursuit 100 to 200 hundred yards behind the Yukon, and closed to within six or seven car lengths. (T. 246-48, 279-80, 291, 309-10, 330-31.) The Yukon had a vanity license plate "BRYAN" in white lettering on a black background. (T. 279-80.) Between "the 60s" and "the forties," two more police cars joined the pursuit.  While still "in the forties," the officers turned on the emergency lights and sirens of their cars and, over his car's "PA system," Passarella ordered the suspects at least three times to exit the highway at the 34th Street off-ramp. (T. 249-52, 291-92, 303, 330, 343-45.) Instead,

9

the suspects continued south with Passarella continuing to direct them to exit the highway. The Yukon exited at the "23rd Street" off-ramp and pulled over on East 25th Street. (T. 252-53, 291, 304, 332.) A video of the pursuit, which was captured by the camera in Passarella's car, was played for the jury. (T. 283-90; People's Exh. 14 [video].) Petitioner did not object to the video being entered into evidence. (T. 285.)

By the time the Yukon pulled over, about eight to ten minutes had passed since Shillingford had first approached Passarella. (H. 82.) Several police officers got out of their cars and ordered the occupants to exit the Yukon. (H. 71-72, 76-78, 110-11.) Passarella and another officer removed Pratt from the driver's seat; Pratt was wearing a red shirt and khaki shorts. (T. 253-54; People's Exhs. 8 [photograph of Pratt] and 14.) Two other officers removed Petitioner from the front passenger seat; Petitioner was wearing a black shirt and blue jeans. (T. 254-55; People's Exh. 9 [photograph of Petitioner].)

Officers handcuffed and frisked the suspects for weapons. (H. 78-80, 101, 111-12.) After searching Petitioner, Passarella recovered $446 in cash from Petitioner's right jeans pocket, and a wallet containing $106 in Petitioner's left jeans

10

pocket. (T. 259-61, 265-66, 305-08, 379-81, 470-72, 653-56, 668-70; People's Exh. 19 [currency].)   Passarella then radioed the Highway division's dispatcher, reported that the officers had "stopped the vehicle," and asked that the 34th Precinct be advised to bring Shillingford to East 25th Street. (H. 80-82, 116.)

During this time in Washington Heights, Shillingford had found a "call box" on Tenth Avenue and called 911. (T. 126-27, 137-39; People's Exh. 6 [911 tape].) About five minutes later, police officers Franny Nunez ("Nunez"), Nerys Ramirez ("Ramirez"), and Anthony Pinzone ("Pizone"), arrived. (T. 139-40, 358-61, 382-85, 445-48, 508, 648, 662-65.)   Shillingford told the officers that, about 15 to 20 minutes earlier, two black men had robbed him at gunpoint, and taken his cell phone and about $500 in cash. (H. 136-37.) He told the officers that one of the robbers had a black handgun and that one wore a red shirt, (H. 138), and that the men fled in a tan truck with a "unique" black license plate. (T. 390, 448-49, 509, 515, 531-32, 648.)

Nunez radioed his dispatcher to determine what unit was in pursuit and provided the information from Shillingford,

11

including that one of the suspects wore a red shirt and the type of vehicle in which the suspects fled. (H. 138-39, 210-15.) About three or four minutes later, Nunez received a report that suspects had been stopped on East 25th Street and Riverside Drive, and was directed to bring Shillingford there. (H. 139-40, 184-85, 196-98, 211, 214-15.) Nunez told Shillingford that a vehicle had been stopped at East 25th Street and asked if Shillingford would accompany them to see if he could identify the occupants[5]. (H. 140, 184-86, 199-200, 216-21.)

Shillingford got in the back of the patrol car, and Nunez and Ramirez drove him to East 25th Street, arriving about 10 minutes later. (H. 140-41.) During the drive, the police radio was on, but Nunez received no further reports about the incident and did not recall any conversation with Shillingford. (H. 141-42, 178, 201-03, 210-11.)

---

[5] On cross-examination, the defense attorneys asked Nunez whether he had informed Shillingford that the suspects were black, that one of the suspects wore a red shirt, and that the stopped vehicle matched the description Shillingford had provided; Nunez answered, "Yes" to these questions. (H. 186, 198-200.) On re-direct examination, Nunez refreshed his recollection with a Sprint report summarizing his communications with the precinct, and testified that he had not received a description of the suspects or the vehicle that had been stopped at East 25th Street. He stated that he had been mistaken on cross-examination, and that he did not convey any description of the individuals or the car to Shillingford. (H. 211-22.)

As they drove down the off ramp where the Yukon was parked, Shillingford spontaneously said, "[O]h that's the car, that's the car." (H. 142, 187-88.)   At this point, it had been about ten minutes since the officers had pulled over the Yukon and 18 to 20 minutes since Shillingford had first approached Officer Passarella. (H. 82-83, 103, 113.) Nunez pulled up about 15 to 20 feet away from where Petitioner and Pratt were standing. (H. 145).   Passarella and "[p]ossibly one other officer" stood with the suspects. No one was holding onto the suspects, and none of the officers in the area had a gun drawn. (H. 83-85, 101, 114-15, 143-45, 188.)

Petitioner and Pratt were facing the patrol car "head on" and there were no obstructions between them and the patrol car. The area was "well lit" by streetlights and headlights, and Officer Nunez could clearly see their faces. (H. 84-85, 146, 193.) At about 9:50 p.m., either Nunez or Ramirez asked Shillingford if those were the men who had robbed him. Shillingford "duck[ed] down" behind the seat in front of him and said, "[Y]es . . . those are [the] guys that robbed me."[6] (H. 147-50, 177-78, 188-89.)

_____ _____ _____

[6] At trial, Shillingford testified that the area was "pretty bright" because of the lights of the police cars and Shillingford was "100 percent sure" that

13

Passarella and Ramirez searched the Yukon and noticed that an odor of marijuana permeated the vehicle. From the top of center console between the front seats, Ramirez removed a plastic cup holder. Inside the console were two bags of marijuana. (T. 265-79, 306-07, 325-28, 369-76, 385-87, 392, 397-98, 458-59, 479-87, 501-03, 521-22, 531, 557-64, 657-59; People's Exh. 2 [marijuana].)

Beneath the marijuana were a black nine millimeter Beretta semi-automatic pistol and a silver .38 caliber Taurus revolver with a brown handle. Both weapons were loaded and both the weapons and the ammunition proved operable. Furthermore, the serial number of the revolver had been "scratched off." (T. 268-69, 277-79, 372-73, 413-19, 436-38, 459, 487-93, 532-33, 570-82, 594-96, 657-59; People's Exhs. 3 [pistol], 12 [revolver].)[7] Per police procedure at the time, Officer Tammy Allen, of the Evidence Collection Unit, "swabbed" the guns for DNA. The guns were not dusted for fingerprints due to the unlikelihood that

---

the men being held were the men who had robbed him. (T. 142-48, 262-63, 333-34, 366-69, 391, 451-55, 512-14, 523-24, 649-51, 664.)

[7] In a criminal complaint, Nunez mistakenly averred that the Evidence Collection Unit had recovered the marijuana as well the guns, but Nunez actually recovered the marijuana himself. (T. 406-09, 416-26, 430-36, 439-41, 478-79, 487-500, 503-05, 521-22, 530-31.)

14

prints could be recovered after the weapons were swabbed. (T. 406-09, 416-26, 430-36, 439-41, 478-79, 487-500, 530-31.) Subsequently, Criminalist Susan Horan of the Office of the Chief Medical Examiner ("OCME") examined the swabs, but neither contained sufficient DNA for testing. In 2008, OCME was able to develop DNA profiles from gun swabs only about ten percent of the time. (T. 700-11, 716-19; People's Exhs. 16, 17 [swabs], 29 [report].)

Meanwhile, Officer Sheikh had received a radio transmission to report to East 25th Street to transport Pratt to the 34th Precinct. When he arrived, he saw Petitioner and Pratt in handcuffs, and the same tan Yukon he had seen earlier in the night. (H. 24-28, 47.)

Pinzone then drove the Yukon to the 34th Precinct, while other officers transported Petitioner, Pratt, and Shillingford. (T. 42-43, 146, 378, 461-62, 470, 651-52, 659-60.) While Sheik was transporting Pratt to the precinct, Pratt asked him what was going on and stated that he wanted to see if he could have someone pick up the Yukon. (H. 29-32, 46-48.) At the precinct, Pratt declined to answer questions. (H. 163-68, 190-91.)

15

At about 2:40 a.m., on July 26th, Officer Nunez and Detective Bubb spoke to Petitioner at the 34th Precinct. Petitioner waived his *Miranda* rights and provided oral and written statements.  Later, at about 7:00 p.m. that night, Petitioner again waived his *Miranda* rights and provided a videotaped statement to an assistant district attorney. Petitioner said that he had come from Brooklyn with his friend "LV" to drop off LV's aunt at the Dyckman Houses. On the way back to Brooklyn, the men had been stopped by the police, who now claimed that there had been guns and drugs in the car. Petitioner said that he did not know the name of LV's aunt and that the Yukon belonged to LV's cousin. (H. 151-63, 168-71, 190-92, 205-06; People's Hearing Exhibits 3 [*Miranda* card], 4 [written statement], and 7 [videotape].)

At the precinct, Pinzone recovered a cell phone from Petitioner, which was designated at trial as CP2. The cell phone number was 347-743-2387, which was the telephone number that Petitioner had provided to the Criminal Justice Agency. (T. 472-74, 476-78, 506-07, 611; Stipulation: 840; Court Exh. 1.) There were four other cell phones found on the floor of the Yukon, designated CP1, CP3, CP4, and CP5. (T. 476-78, 506-07.) CP3's

16

number, 631-805-8614, was the telephone number that Pratt had
provided to the Criminal Justice Agency[8]. (T. 617-19, 639;
Stipulation: 839-40; Court Exh. 1.)

Jeff Strohm ("Strohm"), a records custodian for Sprint
Nextel Telecommunications, testified that, on July 25, 2008,
between 12:24 p.m. and 3:55 p.m., CP2 and CP3 exchanged six
calls, most of which went to voicemail. (T. 758-63; People's
Exh. 36.) Between 9:13 and 9:24 p.m., seven calls to and from
CP2 were transmitted from a celltower that Sprint records listed
at 48 Post Avenue, which was on the same block as 584 Academy
Street. (T. 763-68, 815-826; People's Exhs. 35, 36 [records], 39
[map].) Between 9:53 p.m. and 10:17 p.m., five calls to or from
CP2 were routed through a celltower at 25 Waterside Plaza, in
the vicinity of East 25th Street. (People's Exhs. 35-36, 39.)

Between 9:04 and 9:08 p.m. on July 25, 2008, three
calls to or from Shillingford's cell phone were routed through a

---

[8] CP2 was subscribed to Erica Abraham at 480 Montgomery Street in Brooklyn.
(T. 757-58; People's Exh. 30.) One of the contact numbers was "L.V." at CP3's
number. (T. 612-13.) CP3 contained a contact for "Rambo" at CP2's number and
for "Bleep" at 646-896-6204, which was the number of CP1. (T. 619-24, 635-
41.) CP1 was a prepaid account subscribed to "Mario Lopes" at 70 Nagle
Avenue, New York, New York. (T. 726-27, 734-35; People's Exh. 32.) No number
could be determined for CP4, but it did have CP2's number on its contact list
under "Karen 1" and missed calls from that number. (T. 626-30, 638.) CP5 was
subscribed to Dolores White of Newnan, Georgia. (T. 729-30; People's Exh.
31.)

celltower near East 141st Street in Manhattan. At 9:22 p.m., a
call was initially routed through a celltower near Seaman Avenue
and Dyckman Street. Between 9:22 and 9:26 p.m., three calls were
routed through the cell tower at 584 Academy Street. (T. 727-29,
773, 780-81, 808-15; People's Exhs. 33, 35, 37-38.)

By New York County Indictment Number 3829/08,
Petitioner and Pratt were each charged with three counts of
first and second degree robbery, two counts of second-degree
weapon possession, one count of third-degree weapon possession,
and one count of fifth-degree marijuana possession.

### B. The Pre-Trial Hearing

On May 13, 14, and 18, 2009, a joint *Wade / Huntley*
hearing was held to determine the admissibility of
Shillingford's identification testimony and the co-defendants'
post-arrest statements to the police. *United States v. Wade*,
388 U.S. 218 (1967); *People v. Huntley*, 15 N.Y.2d 72 (1965).

18

Neither Petitioner nor Pratt presented any evidence at the hearing.

With regard to the *Wade* portion of the hearing, the court ruled that Shillingford would be permitted to identify Petitioner and Pratt at trial, finding the show-up identification "almost classic [in] that it was done promptly in time and in space." (H. 244-45.)

With regard to the discrepancy in Officer Nunez's testimony, the court found that the People had refreshed Nunez's recollection with the Sprint reports and that Nunez had not described the suspects to Shillingford prior to the show-up procedure. The court found that, even if Nunez had recounted a description of the suspects to Shillingford, the show-up identification was not unduly suggestive. (H. 244-45.) The court held further that Officer Sheikh's viewing of Defendants at East 25th Street had not been an arranged identification and, thus, Sheikh would be allowed to offer identification testimony at trial. (H. 245).

With respect to the *Huntley* portion of the hearing, the court ruled that all of the post-arrest statements would be

19

admissible at trial, because Pratt's statements on the way to
the precinct had been "volunteered" and because Petitioner's
formal statements had been made after valid waivers of his
*Miranda* rights. (H. 244.)


### C. The Trial

At trial, Shillingford identified Petitioner and Pratt
as the men who had robbed him. (T. 144-45.) He also identified
photographs of the Yukon as the SUV in which the robbers had
fled. (T. 134-35; People's Exh. 1.) Officer Passarella testified
that he was "[o]ne hundred percent certain" that the Yukon was
the SUV Shillingford had pointed out to him. (T. 294.)

Shillingford further testified that the Beretta
recovered from the Yukon "look[ed]" like the gun Petitioner had
wielded during the robbery and that the bags of marijuana
recovered from the SUV were the same size as the bag he had seen
Petitioner holding inside 584 Academy Avenue. (T. 96-98, 105-06,
172-73; People's Exhs. 2 [marijuana], 3 [pistol].)

Petitioner's girlfriend, Helena Boyd ("Boyd"),
testified that Petitioner was known in some quarters as "Rambo"

20

and was friendly with Levon Pratt, who went by the nickname
"L.V." (T. 854-57.) However, the men did not spend much time
together and Boyd had met Pratt only "once or twice." (T. 854-
58.)

Petitioner regularly used the cell phone which was
recovered from him upon his arrest. The phone belonged to his
sister, Erica Abraham ("Abraham"), but Petitioner used it
because he did not have to pay the bill and because the phone
had free calling on nights and weekends. (T. 844, 847-51, 860-
62.) Boyd recognized one of the cell phones found on the floor
of the Yukon as a prepaid cell phone Petitioner used, but she
could not remember the telephone number. (T. 842-44, 848, 858-
60.) Petitioner had this second phone because Abraham would be
"angry" if he used up her "allowed minutes." (T. 862.)

On July 24, 2008, Petitioner came to Boyd's home to
"get some money and some stuff" for a party celebrating their
daughter's first birthday. (T. 845-46, 852-53.) Boyd gave
Petitioner $200 to buy decorations and "party stuff." (T. 846,
853-54.) Although the girl's birthday was September 14th, Boyd
and Petitioner "didn't want to wait until the last minute" to
buy party favors. (T. 845, 852-53.)

21

Petitioner's mother, Cecilia John ("John"), testified that she gave Petitioner $200 to $400, and that Petitioner had access to one of her bank accounts. (T. 863-67, 892, 899-901.) John had an income of roughly $1,000 a month from disability payments and savings. (T. 895-97.) She also owned a store in St. Maarten, but was not sure how much she earned from it. She would wire proceeds from St. Martin to Petitioner in New York for him to pay bills on her behalf. (T. 896-901.) John also had a pension in St. Maarten pension and her "kids [gave her] money down there also." (T. 897, 900.)

Initially, John testified that she wired money from St. Maarten to Petitioner in January and March 2008. (T. 865-73, 888.) Subsequently, she said that she could not remember how many times she had wired Petitioner money and admitted that she had done so in July 2008. (T. 872-77, 900.) She testified that she resided in Brooklyn for almost all of 2008, going to St. Maarten in December. (T. 880-82, 887-89.)

Pratt testified on his own behalf and denied committing any robbery on July 25, 2008. He stated that he was unaware of any contraband in the Yukon, and that he did not

22

smell any marijuana in the vehicle. If he had smelled marijuana, he would not have gotten inside the vehicle. (T. 911, 923-24, 930, 960-61.)

Pratt testified that, in July 2008, he lived with his wife and two children in Crown Heights, Brooklyn. For the previous nine years, he had worked as a carpenter and had also obtained a "plumbing license." Pratt earned $700 to $1,500 a week, and his wife worked at a home for the mentally disabled. (T. 909-10.)

On June 7, 2004, Pratt was convicted of third-degree weapon possession for possessing a loaded firearm and of fifth-degree drug possession for possessing more than 500 milligrams of cocaine. The convictions arose from separate incidents. (T. 910-11, 959-60.)

On July 25th, 2008, at about 7:00 p.m., Pratt's aunt, Linda Davis, asked him to drive her and her daughter to Washington Heights in order to visit a friend. (T. 916-18, 935-36, 946.) Pratt testified that, about a week after the robbery, his aunt moved down south. And, although she "frequently" called, Pratt's relatives could not prevail upon his aunt to

23

testify because she was "in the process of fixing up the house," calling from various numbers, and Pratt's relatives would not call back these numbers. (T. 919-20, 946-49.)

Pratt did not have access to his own car on July 25, 2008. The previous day, July 24th, had been his birthday, but he and his wife had been unable to celebrate because she had to work. (T. 916-17, 933-34, 952-53, 967.) Accordingly, on July 25th, Pratt's wife took the keys to Pratt's car so that he "could stay in the house so she could get off early to celebrate." (T. 916-17, 934-36.)   Pratt had gone to work that day, taking a cab to a jobsite at 127th Street and Lenox Avenue in Manhattan, and got a ride home from an unnamed cousin. (T. 938-40.) There was also a subway stop in Pratt's neighborhood, but he had not ridden the subway "in 13, 14 years." (T. 935.)

At about 7:30 p.m., Pratt borrowed a Yukon from a local barber named "Marlon." (T. 914-16, 924, 936-38, 944, 947-50.) Pratt had known Marlon for six or seven years, but did not know Marlon's last name or his telephone number. (T. 915, 932-33, 937.) After picking up the Yukon, Pratt telephoned Petitioner. (T. 943-44.)   The two men "h[u]ng out" about "once every two weeks or so" and "play[ed] basketball or something."

24

(T. 918). Petitioner went by "Rambo," while Pratt was known as "L.V." (T. 958.) Pratt picked up Petitioner to accompany him to Washington Heights because Pratt did not know where he was going, never traveled alone when going to a strange neighborhood, and wanted Petitioner to keep him company on the ride back. (T. 916-18, 924, 939-40.)

Pratt's aunt "guided" the men across the Brooklyn Bridge, to the FDR Drive, which they followed to Washington Heights. There, Pratt pulled over on Tenth Avenue across the street from the Dyckman Houses. (T. 916, 920-21, 929-30, 940-41.) Pratt carried a baby seat across the street for his aunt, and told her that he would wait by the Yukon. (T. 920-21, 929, 951.) He was waiting to see if his aunt was staying the night, and because he needed directions to get home. (T. 918-21, 951-52, 961-62.) Petitioner was parked in sight of the FDR Drive which he had just exited and he had driven the road a "million times" before. Nonetheless, he was not sure "which way to go back home." (T. 919, 940-42.)

While he waited, Pratt urinated by the Yukon; a police officer approached and gave him summonses for "urinating and unreasonable noise." (T. 920-21, 951.) After about 20 to 25

25

minutes, Pratt's aunt came downstairs, told him that she was staying, and revealed that, to get home, he should make a U-turn and return the way he had come. (T. 919, 922-23, 929-30.)

Pratt and Petitioner drove south on the FDR Drive and, as they drove past 34th Street, they saw "sirens come on"; Pratt complied with an order from the police to pull over at the next exit as soon as he heard the request. (T. 926-28, 956-58.) Police officers handcuffed Pratt and Petitioner, and Shillingford was brought to the scene; it was the first time Pratt had ever seen Shillingford. (T. 929-30.) Later, Officer Sheikh drove Pratt back to the precinct. Pratt asked what he had done, protested that he had not done "anything," and asked if someone could pick up the Yukon. (T. 954-55.)

The jury convicted Petitioner of one count of Robbery in the First Degree, one count of Robbery in the Second Degree, two counts of Criminal Possession of a Weapon in the Second Degree, and one count of Criminal Possession of Marijuana in the Fifth Degree. (T. 1135-37.) Petitioner was sentenced to concurrent terms of imprisonment of fifteen years for his convictions of first- and second-degree robbery and for each count of second-degree weapon possession, and three months for

26

the marijuana conviction, to be followed by five years of post-release supervision.  (S. 18.)  Pratt was convicted of the same crimes and was given the same sentence as Petitioner.

### D. Direct Appeal

Petitioner appealed from his judgment of conviction to the Appellate Division, First Department. He argued that the hearing court should have suppressed Shillingford's in-court identification of him because the show-up identification procedure was unduly suggestive. He also claimed that the trial court erred in admitting the video of Pratt's arrest, as well as permitting a lay person to testify as an expert concerning cell phone site data. Lastly, Petitioner argued that his sentence was excessive. (Exhibit A.) The People filed a brief in opposition. (Exhibit B.)

On November 17, 2011, the Appellate Division unanimously affirmed Petitioner's judgment of conviction, finding that "[t]he prompt showup was part of an unbroken chain of exigent events," and that it was not unduly suggestive. The court also found that the evidentiary rulings made below were proper exercises of discretion, and, in any event, any error

27

regarding those rulings were harmless in light of the overwhelming evidence of Petitioner's guilt. Lastly, the court held that Petitioner's sentence was not excessive. (Exhibit C; *People v. John*, 89 A.D.3d 552 [1st Dep't 2011].)

Petitioner sought leave to appeal to the New York Court of Appeals, asking the court to review all of the claims raised below. (Exhibit D.) The People opposed the application (Exhibit E), and on February 2, 2012, leave to appeal was denied. (Exhibit F; *People v. John*, 18 N.Y.3d 925 [2012].)

### E. The Instant Petition

Now, Petitioner seeks federal habeas corpus relief, claiming that: (1) he was denied due process of law because of an unduly suggestive show-up identification; (2) the trial court improperly permitted a lay witness to provide expert testimony regarding the cell phone site data, which was used to place Petitioner in the vicinity of the crime scene; (3) Petitioner's due process rights were violated when the trial court allowed the jury to view a video of Pratt's arrest; and (4) his sentence was excessive.

## I. STANDARD OF REVIEW

AEDPA sets a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 [2002]). AEDPA merely "preserves authority to issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents. It goes no farther." *Richter*, 131 S. Ct. at 786. Indeed, "[28 U.S.C. §] 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* (internal quotations and citation omitted).

As to any claim adjudicated on the merits in state court, Petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or was based

on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

With respect to the "contrary to" clause, the writ may issue in two circumstances: (1) if the state court decision is contrary to Supreme Court precedent on a question of law; and (2) if the state court decision addresses a set of facts "materially indistinguishable" from a relevant Supreme Court case and arrives at a result different than that reached by the Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *Earley v. Murray*, 451 F.3d 71, 74 (2d Cir. 2006).

A state court decision involves an "unreasonable application" of Supreme Court precedent when the state court either "identifies the correct governing legal rule" from the Supreme Court's cases but "unreasonably applies it to the facts" of the case, or "unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, at 407. "The 'unreasonable application' clause requires the state court

30

decision to be more than incorrect or erroneous;" it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Finally, with respect to factual determinations made by the state courts, a federal reviewing court must apply a "presumption of correctness," and Petitioner bears the burden of rebutting that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001); *see Whitaker v. Meachum,* 123 F.3d 714, 715 n.1 (2d Cir. 1997) (deference will be given to factual findings by both state trial and appellate courts).

## II. The State Court's Determination that the Show-Up Identification Procedure was not Unduly Suggestive was Consistent With and a Reasonable Applicable of Federal Law

Petitioner alleges that improper police conduct rendered the show-up identification by Shillingford unduly suggestive, because before Shillingford made the identification, Nunez told Shillingford that he would be viewing two men who matched the description Shillingford had given police of the

perpetrators and that the men had been stopped in a car that
matched Shillingford's description of the getaway vehicle.


In determining the constitutionality of an in-court
identification based on an out-of-court identification
procedure, a reviewing court should apply a two-part test:
First, Petitioner must establish that the identification
procedure was unnecessarily suggestive; then, if Petitioner has
met that burden, the Court must determine whether the
identification remains reliable based on the totality of the
circumstances. *See Manson v. Brathwaite*, 432 U.S. 98, 107-14
(1977); *see also Neil v. Biggers*, 409 U.S. 188, 198-99 (1972);
*Dickerson v. Fogg*, 692 F.2d 238, 244 (2d Cir. 1982).


Here, the record demonstrates that the identification
conducted was not unnecessarily suggestive.  Petitioner bases
his claim on Nunez's testimony on cross examination, during
which Nunez answered "Yes" when asked whether he had informed
Shillingford that the suspects were black, that one of the
suspects wore a red shirt, and that the stopped vehicle matched
the description Shillingford had provided, prior to bringing
Shillingford to the show-up. (H. 186, 198-200.)  This testimony

32

was not credited by the trial court; rather, the court accepted
Nunez's re-direct testimony, in which Nunez refreshed his
recollection with a Sprint report summarizing his communications
with the precinct, and testified that he had not received a
description of the suspects or the vehicle that had been stopped
at East 25th Street and as such could not have conveyed any such
description of the individuals or the car to Shillingford before
he identified Petitioner and Pratt. (H. 211-22.)

        The trial court's finding on this issue was affirmed
by the Appellate Division and is entitled to the presumption of
correctness.  *See* 28 U.S.C. § 2254(e)(1).  Petitioner has not
stated any evidence to overcome this presumption.  Accordingly,
because the trial court found that Nunez did not make any
improper comments to Shillingford prior to the show-up, there is
no evidence that the identification procedure was unduly
suggestive.

        Even if the trial court's findings of fact were
rejected, the identification remains reliable given the totality
of the circumstances.  Federal Courts have consistently held
that show-up identifications are proper when they are held in

close spatial and temporal proximity to the crime scene for the

purpose of determining whether a suspect should be arrested or

released.  As the Second Circuit held in *United States v.*

*Bautista,* 23 F.3d 726, 730 (2d Cir. 1994),

> [t]he fact that the suspects were handcuffed, in the
> custody of law enforcement officers, and illuminated
> by flashlights also did not render the pre-trial
> identification procedure unnecessarily suggestive. In
> this case, handcuffs, custody, and flashlights were
> all necessary incidents of an on-the-scene
> identification immediately following a night-time
> narcotics raid. Because the on-the-scene
> identification was necessary to allow the officers to
> release the innocent, the incidents of that
> identification were also necessary. . . . [A] prompt
> showing of a detained suspect at the scene of arrest
> has a very valid function: to prevent the mistaken
> arrest of innocent persons.

*Id.; see also United States v. Butler*, 970 F.2d 1017, 1021 (2d

Cir. 1992) (identification proper where suspects were brought to

a victim sitting in a police car).


     Regardless, the identification was reliable because

there is no substantial likelihood that Shillingford

misidentified Petitioner as one of the men who robbed him.

*Perry v. New Hampshire*, 132 S.Ct. 716, 724 (2012) (quoting

*Simmons*, 390 U.S. at 384-85) (even if a show-up is found unduly

suggestive, due process requires the courts to assess, on a

34

case-by-case basis, whether improper police conduct created "a very substantial likelihood of misidentification."). The hearing evidence demonstrates that the show-up took place approximately twenty minutes after Shillingford first described the robbers to Passarella, (H. 82-83, 103, 113), and occurred approximately ten miles from the crime scene. Petitioner and Pratt were standing in a well-lit area facing the patrol car where Shillingford was seated, and there were no obstructions between them and the car. (H. 84-85, 146, 193.) Petitioner and Pratt were with one or two officers, but neither officer was holding onto the suspects and none of the other officers in the area had a gun drawn. (H. 83-85, 101, 114-15, 143-45, 188.) When asked if he recognized the suspects, Shillingford "duck[ed] down" behind the seat in front of him and unequivocally stated, "[Y]es . . . those are [the] guys that robbed me." (H. 147-50, 177-78, 188-89.) At trial, Shillingford further testified that the area was "pretty bright" because of the lights of the police cars and Shillingford was "100 percent sure" that the men being held were the men who had robbed him. (T. 142-48, 262-63, 333-34, 366-69, 391, 451-55, 512-14, 523-24, 649-51, 664.)

35

In addition, prior to the show-up, Shillingford had provided the police with a description of the robbers[9], stating that they were two black men, one wearing a red shirt, one wearing a black shirt, and that one of the robbers carried a black gun.  (H. 138.)  He also pointed out the vehicle in which the robbers fled, a tan SUV.  (T. 390, 448-49, 509, 515, 531-32, 648.)  Petitioner and Pratt were wearing a black shirt and a red shirt, respectively, were driving a tan SUV, and a black handgun was found in their vehicle.  Taken together, the evidence demonstrates that there is no substantial likelihood that Shillingford misidentified Petitioner and Pratt as the men who robbed him, and the state court's decision to admit Shillingford's in-court identification at trial was a reasonable application of both state and federal law.

### III. Petitioner's Claims Regarding the Admission of Evidence, including a Video of Pratt's Arrest and Testimony about Cell Phone Site Data, do not Implicate the Federal Constitution and are Thus not Cognizable on Federal Habeas Review

---

[9] The fact that Shillingford did not specify the height or weight of the Defendants does not, as Petitioner maintains, mean that Shillingford did not give a description of the Defendants, or that he was not able to accurately identify the Defendants when he saw them. To the contrary, Shillingford specified the race and clothing of the Defendants, as well as what the general make of the car that the Defendants left the crime scene in, and explained that during the robbery, he had an unobstructed view of Defendants (T. 390, 448-49, 509, 515, 531-32, 648.)

36

Petitioner next claims that he was denied due process of law because (1) the trial court improperly allowed the jury to view a video of Pratt's arrest and (2) the court erred in allowing a lay witness to provide expert testimony concerning cell phone site data, which the prosecution used to place Petitioner near the crime scene.

The Second Circuit has held that "not all erroneous admissions of [prejudicial] evidence are errors of constitutional dimension." *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998). Instead, the introduction of prejudicial evidence does not violate due process unless it "is so extremely unfair that its admission violates fundamental conceptions of justice." *Id.* (quoting *Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)). Put another way, improperly admitted evidence does not violate due process unless it is "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Johnson v. Ross,* 955 F.2d 178, 181 (2d Cir. 1992) (quoting *Collins v. Scully,* 755 F.2d 16, 19 (2d Cir. 1985) (holding that courts must review erroneously admitted evidence "in light of the entire record before the jury") ); *see also*

*Benjamin v. Greiner,* 296 F. Supp. 2d 321, 332 (E.D.N.Y. 2003)
(quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)) ("an
error of constitutional dimensions will merit habeas relief only
if it had a 'substantial and injurious effect or influence in
determining the jury's verdict.'").

Petitioner fails to demonstrate both that the
challenged evidentiary rulings were erroneous, and that they had
a substantial and injurious effect in determining the jury's
verdict.

With respect to the video, Petitioner contends that
the court erred in admitting a video that depicted several
seconds of Pratt's arrest.  (H. 282-84, 438-43; T. 285.)

There is no indication that admission of the video,
which had clear probative value, in any way prejudiced the jury
against Petitioner.  The video, the vast majority of which
depicted Passarella's chase of the Yukon down the highway, did
not depict the Petitioner, and served instead to illustrate and
corroborate Officer Passarella's testimony about his pursuit of

the tan Yukon down the FDR Drive.  Only the last few seconds of
the video depicted Pratt's arrest, during which Petitioner was
not shown.  Further, Petitioner did not protest admission of the
video prior to or during trial[10].  To the contrary, during
Petitioner's opening statement, his attorney told the jury that
they would "see" that, when told to pull over, the co-Defendants
"calmly pulled over, stuck their hands out of the vehicle, [and]
didn't try to run away."  (T. 21-22.) Finally, the video did not
provide the basis for the jury verdict, because other evidence,
such as Shillingford's identification, the contraband and
weapons found in the car, and Petitioner's own statements to the
police, overwhelmingly demonstrated his guilt.


     As a result, Petitioner has failed to show that the
admission of the video had a "substantial and injurious effect
or influence" on the jury's decision to convict him.  *See*
*Chandler v. Napoli*, 2011 WL 4382265, at *4-5 (E.D.N.Y. July 19,
2011) (because the video, which did not depict the petitioner
had probative value, and "because other evidence, such as
Hodge's statements to police implicating Chandler, Chandler's

---

[10]  On direct appeal, the People argued that this claim was unpreserved for
appellate review.  The Appellate Division did not address the preservation
argument and denied Petitioner's claim on the merits.

confessions, and the .32 caliber gun found at his home proved his guilt," petitioner failed to show that the video had a "substantial and injurious effect or influence" on the jury's decision to convict him).

With respect to Petitioner's claim that the court improperly allowed Strohm, a lay witness, to provide expert testimony regarding cell phone site data, Strohm did not provide the jury with an expert opinion and in any event the testimony was not "sufficiently material to provide the basis for conviction." *Johnson v. Ross,* 955 F.2d 178, 181 (2d Cir. 1992).

During the trial, the People called Strohm, a records custodian with Sprint Nextel Telecommunications, to testify about the five cell phones recovered after Petitioner's arrest. Strohm testified that, as a custodian of records, part of his job is to testify in court about various telecommunications records, including subscriber information, call detail reports, the duration of calls, whether a call is ingoing or outgoing, and cell site data that indicates the specific cell tower where a subscriber's phone is "pinging off." (T. 722-25.) Strohm then identified several exhibits containing subscriber and call

40

detail information that were accepted into evidence without objection.  (T. 725-38; People's Exhs. 30-34.)

Strohm's explanation was not an expert opinion as to the significance of the cell site records; rather, he provided the jury with an explanation of how the records are created and what kind of information is recorded from the cell towers. Petitioner thoroughly cross-examined Strohm about his qualifications and educational background, and Strohm made it clear to the jury that he had no educational background in "[t]elecommunications," that he did not know about the specific receiving capabilities of different celltowers, and that he had not been qualified as an expert "in this subject matter."  (T. 784, 786-88. 795-96, 799.)  Strohm explained that his testimony concerning cell towers and cell phone pinging was based on his experience in the records department.  (T. 784-85.)  Based on this record, the Appellate Division correctly concluded that the trial court's admission of Strohm's testimony comported with New York law.

Even if Strohm's testimony were improperly admitted, Petitioner cannot show that it was sufficiently material as to

41

provide the basis for his conviction.  Strohm provided the jury
with a summary of certain portions of the phone records, but he
was never asked to make any opinions or to draw any conclusions
as to where Petitioner was at the time of the robbery.  When
asked if he could determine "exactly where a cellphone was
transmitting from" by reviewing the cell site records, Strohm
testified that he could not.  (T. 782-84.)  Ultimately, Storhm
offered no testimony, opinion or otherwise, concerning the
likelihood that Petitioner was at 584 Academy Street at the time
of the robbery.  Further, in the context of the overwhelming
evidence of Petitioner's guilt, Strohm's testimony, which merely
placed Shillingford in the vicinity of the crime, cannot fairly
be seen as "sufficiently material to provide the basis for
conviction or to remove a reasonable doubt that would have
existed on the record without it." *Johnson v. Ross,* 955 F.2d
178, 181 (2d Cir. 1992).


        Accordingly, neither of Petitioner's complaints about
the trial court's evidentiary rulings is cognizable on federal
habeas review, or infringed upon his right to a fair trial.
*See, e.g.*, *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998)
(erroneous admissions of prejudicial evidence are only of
constitutional dimension warranting habeas review if the error

is "so extremely unfair that its admission violates fundamental conceptions of justice.") (internal citations omitted).

### IV.  Petitioner's Excessive Sentence Claim is not Cognizable on Federal Habeas Review and is Without Merit

Petitioner's final claim, that his sentence was unduly harsh and excessive, is not cognizable on federal habeas review and is in any event without merit.

An excessive sentence claim is not a ground for federal habeas corpus relief as long as the sentence is "within the range prescribed by state law." *Ross v. Gavin*, 101 F.3d 68 (2d Cir. 1996) (quoting *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *see also Alfini v. Lord*, 245 F. Supp. 2d 493, 502 (E.D.N.Y. 2003).  Petitioner's sentence was within the authorized range, which Petitioner does not dispute, and in fact was less than the maximum sentence applicable to his offenses. For his conviction of first-degree robbery alone, a class B violent felony offense, Petitioner faced a maximum sentence of twenty-five years in prison (*see* Penal Law § 70.02(3)(a)).

43

Petitioner's aggregate prison sentence for all of his offenses was only fifteen years.  Petitioner's age or his lack of prior criminal history[11] does not alter the nature of Petitioner's violent offense, or the fact that his sentence was well beneath the maximum guidelines.  *See, e.g., Castro v. Sullivan,* 662 F.Supp. 745, 753 (S.D.N.Y.  1987)  (holding two concurrent terms of twenty-five years to life were not excessive in the case of a twenty-two year old with no prior record who was convicted of second degree murder, first degree robbery, and second degree criminal possession of a weapon; because sentence did not exceed maximum prescribed under the statute, petitioner failed to raise any constitutional issue); *Rivera v. Quick,* 571 F.Supp 1247, 1248-49 (S.D.N.Y.  1983) (because petitioner's sentence was within the range permitted by state law, its length did not a constitutional issue).


        Because Petitioner's underlying sentence did not exceed the maximum prescribed, Petitioner's excessive sentence claim is inappropriate for habeas relief. *See Ross v. Gavin*, 101 F.3d 68 (2d Cir. 1996).

---

[11] Petitioner alleges that this was his first felony offence, but has acknowledged that in 2004 he was adjudicated as a youngful offender for attempted murder.  (Attorney General's Brief, "Br."; Exhibit A, at 50.)

44

**V. Conclusion**


For the foregoing reasons, Petitioner's petition for writ of habeas corpus is denied.


It is so ordered.

**New York, NY**
**February 28, 2014**

_____
ROBERT W. SWEET
U.S.D.J.